# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION AT LAFAYETTE

WENDY BLEVINS,              )
         Plaintiff,       )
                   )
        v.            )     CAUSE NO.: 4:08-CV-87-PRC
                   )
MICHAEL J. ASTRUE,     )
Commissioner of Social Security   )
Administration,          )
         Defendant.     )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Wendy Blevins on

November 17, 2008, and a Social Security Opening Brief [DE 16], filed by Plaintiff on March 11,

2009. Plaintiff requests that the June 28, 2007 decision of the Administrative Law Judge to deny

her disability insurance benefits be reversed or, alternatively, remanded for further proceedings. For

the following reasons, the Court denies Plaintiff's request and reaffirms the decision of the

Administrative Law Judge.

## PROCEDURAL BACKGROUND

On July 8, 2004, Plaintiff applied for disability insurance benefits, alleging that she became

disabled as of May 21, 2004.[1] Plaintiff's application was initially denied on September 16, 2004,

and again upon reconsideration on January 31, 2005. On February 8, 2005, Plaintiff filed a timely

request for an administrative hearing, and, on December 13, 2006, Plaintiff appeared with counsel

and testified at a hearing before an Administrative Law Judge ("ALJ"). Plaintiff's husband and a

---

[1] Although Plaintiff references a supplemental security income ("SSI") claim in her Opening Brief and cites
the sections of the Federal Code of Regulations regulating SSI claims, Plaintiff applied only for disability insurance
benefits.

vocational expert also testified. In a decision dated June 28, 2007, the ALJ denied Plaintiff's claim

for disability benefits, which included the following findings:

> 1. The claimant meets the insured status requirements of the Social Security Act
> through December 31, 2008.
>
> 2. The claimant has not engaged in substantial gainful activity since May 21, 2004,
> the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq*.).
>
> 3. The claimant has the following severe impairments: obesity; degenerative lumbar
> disc disease; osteoarthritis; and right carpal tunnel syndrom, status post release (20
> CFR 404.1520(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that
> meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart
> P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the undersigned finds that the
> claimant has the following residual functional capacity: she is able to lift/carry 20
> pounds occasionally and 10 pounds frequently; she is able to stand/walk/sit about six
> hours in an eight-hour workday; and she can frequently handle, finger, and feel with
> the right upper extremity.
>
> 6. The claimant is capable of performing past relevant work as a bank teller, retail
> salesperson, and food service worker as she actually performed the latter job. This
> work does not require the performance of work-related activities precluded by the
> claimant's residual functional capacity (20 CFR 404.1565).
>
> 7. The claimant has not been under a disability, as defined in the Social Security
> Act, from May 21, 2004 through the date of this decision (20 CFR 404.1520(f)).

R. 19-24. Following the Appeals Council's denial of Plaintiff's request for review of the decision

on September 12, 2008, Plaintiff initiated the instant civil action for judicial review of the

Commissioner's final decision on November 17, 2008.

Plaintiff filed an Opening Brief on March 11, 2009, and the Commissioner filed a Response

Brief on May 26, 2009. Plaintiff did not file a Reply Brief, and the time to do so has passed. On

June 24, 2009, the Court ordered the Commissioner to supplement the Social Security

Administrative Record in the case with missing pages, and the Commissioner filed the missing pages on August 12, 2009.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636 and 42 U.S.C. § 405(g).

## FACTS

### A. Background

Plaintiff, born in 1972, was thirty-five years old on the date of the ALJ's decision. She completed high school and has past relevant work as a bank teller, food service worker, and retail sales worker.

### B. Medical Evidence

*1. Physical Medical History*

In April 2003, more than a year before her alleged onset date, Plaintiff was referred to M.R. Nekoomaram, M.D., an orthopedic surgeon, for complaints of lower back pain without radiculopathy for several weeks. After taking her history, examining Plaintiff, and sending her for an MRI, Dr. Nekoomaram found that Plaintiff had lumbar degenerative disc disease at T12-L1, L3-L4, L4-L5, with no evidence of disc herniation or nerve root impingement. He noted that she was started on an anti-inflammatory medication and therapy modalities, that she was currently benefitting from the treatments, and that she was "better." R. 115. He stated that if she did not continue to improve with the continued existing treatment, other treatment would be tried.

Plaintiff returned to see Dr. Nekoomaram on April 5, 2004, more than a month before her alleged onset date, when she reported that her pain had been worse in the last month. Dr. Nekoomaram reported that Plaintiff complained of low back pain and radiation of the pain to both hips for the past several years. He further noted that Plaintiff had taken a number of medication treatments and analgesics, physical therapy, and three steroid injections, without too much improvement "according to [Plaintiff]." R. 110. His diagnosis was degenerative disc disease at L3-L4, L4-L5, and L5-S1, without disc herniation or stenosis, and he recommended conservative treatment including physical therapy, anti-inflammatory medication, and weight reduction. Dr. Nekoomaram also offered Plaintiff an epidural steroid injection, but she stated she wanted to think about it.

On the same date, Dr. Nekoomaram wrote a note stating that Plaintiff was not to lift more than 10 pounds at work. He continued, "[I]f there is no job with that restriction available, then she remains off work for three w[ee]ks[.]" R. 112. On April 12, 2004, Dr. Nekoomaram sent a letter to Dr. Hoff, the family doctor with whom Ms. Martin worked, summarizing his examination, findings, and proposed treatments.

On August 31, 2004, Plaintiff saw Thomas P. Barbour, M.D., for a consultative evaluation. Plaintiff told him that she was unable to continue normal activities at home and at work due to chronic back pain for nine years. She said that she worked as a common laborer for most of her life and recently worked in a cafeteria, but was unable to continue this work due to her pain. She expressed that the pain was present daily and radiated down her right leg. She used physical therapy and Celebrex with no success, she had not received any injections, and no surgery was planned. She stated that her lifting limit was 10 pounds or less and that she avoided light housework that required

repetitive lifting, bending, pulling, or squatting, including yard work, vacuuming, and mopping. She also reported intermittent numbness in the right leg that tended to come and go and that weakness in that leg presented the problem of frequent falls. She complained of chronic right hip and right knee pain but she had had no evaluation or treatment other than the use of Celebrex. She had to limit her standing and walking to 15 minutes or less. Plaintiff also complained of pain associated with tingling in the right hand radiating through the wrist into the right arm. She said she had no trouble picking up coins or opening jars, and she did not complain of shoulder pain. She had previously been told she might have carpal tunnel syndrome, but no treatment had been prescribed, other than the use of Celebrex. Her medications at that time were Celebrex, Premarin, Lipitor, Effexor, Xanax, and Valium as needed for muscle spasm. Dr. Barbour had been supplied with records of her treatment for lumbar degenerative disk disease, including an MRI scan of the lumbar disk showing mild diskogenic degenerative changes at the level of L4-5 with mild defacement of the thecal sac.

On examination, Dr. Barbour found that Plaintiff was 61.5 inches in height and weighed 206 pounds. Her posture and gait were normal, and she had no difficulty getting on and off the examination table. The musculoskeletal examination showed that Plaintiff was able to walk on her heels and toes, tandem walk, hop, and squat with back pain. The range of motion for the spinal column and joints was normal, except her forward flexion of the lumbar spine was 75 degrees (90 degrees is normal). On the neurological examination, muscular strength was normal in all areas, deep tendon reflexes were normal, sensation to pinprick and soft touch were decreased over the right L3 to S1 dermatome. Grip strength and fine finger manipulation were normal. A subsequent x-ray

report of the lumbar spine, ordered by Dr. Barbour, showed minimal spondylosis at L3-4 and an otherwise negative study.

Dr. Barbour's impression was chronic back pain with a history of degenerative disc disease and possible radiculopathy; possible carpal tunnel syndrome and/or synovitis or tendinitis involving the right hand and wrist; intermittent headaches; and elevated blood pressure. Dr. Barbour recommended that Plaintiff seek follow-up for her various complaints.

In September 2004, J. Corcoran, M.D., a state agency consulting physician, reviewed the record and concluded that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday. These limitations meant Plaintiff could perform the exertional requirements of light work with constant reaching with both hands and frequent handling, fingering, and feeling with the right hand. J. Gaddy, M.D., a state agency reviewing physician, affirmed Dr. Corcoran's RFC assessment in January 2005.

On September 13, 2004, Plaintiff saw Weldon T. Egan, M.D., a surgeon, on referral from Dr. Pryor. She complained of lower back pain that radiated into the sacral region and down her right leg, numbness in the toes of her right foot, and weakness of the right leg, which sometimes gave way. She stated that these symptoms had been present for six months. On examination, she was in mild distress with no obvious spinal deformity. Flexion and extension of the back were normal, there was no muscle spasm, and motor function was intact. There was some slight decreased sensation to light touch in the sole of the right foot, and Plaintiff had a slight limp favoring the right side. On that date, Dr. Egan administered a lumbar epidural steroid injection under fluroscopic guidance and subsequently administered a second injection on October 4, 2004.

On October 2, 2004, electromyography and nerve conduction studies were indicative of early carpal tunnel syndrome of the right wrist.

On November 15, 2004, an MRI of Plaintiff's left knee showed an undersurface tear of the posterior horn of the medial meniscus and poor visualization of the anterior cruciate ligament which the radiologist opined may have been at least partially torn. Plaintiff stated to her surgeon, Lisa M. Ronback, M.D., that she had been doing the limbo with her children on November 4, 2004, when she tripped and felt a pop in her left knee.

On December 2, 2004, Dr. Ronback performed both arthroscopic surgery on Plaintiff's left knee for suspected internal derangement and surgery for a right carpal tunnel release. The post-operative treatment plan was for outpatient physical therapy three times a week for four weeks, and Plaintiff's rehabilitation potential was listed as "good." R. 303. Plaintiff returned to see Dr. Ronback for follow up on December 17, 2004. Although the December 17, 2004 clinic note indicates a follow up visit for late January, the record does not show any subsequent visits.

2. *Mental Medical History*

Plaintiff underwent a total abdominal hysterectomy in October 2002, and in January 2003, her gynecologist, James A. Hall, M.D., reported that she had done very well following this surgery, but had developed "mild depression" so he started her on Prozac. R. 105. During the period from April 28, 2003, to August 30, 2004, Plaintiff was involved in individual psychotherapy with the Four County Counseling Center to treat her depression. In an assessment at the time of her August 2004 discharge, Plaintiff's therapist, on a form countersigned by a psychiatrist, stated that Plaintiff was motivated for treatment, cooperative, and engaged. Her mood was euthymic (not depressed), her affect was broad, her was speech clear, cohesive, and coherent, and her thought processes were

logical and sequential. There were no signs of distractibility unless she was suffering from back pain. She was fully oriented, was able to remember all three words after five minutes, and appeared to have a normal memory. She exhibited dependency on her husband regarding finances and family relations. The assessment indicates that she had no impairment in maintaining daily living skills and no impairment in attending to simple tasks. Plaintiff was found to have mild depressive symptoms, and her prognosis was good regarding depression. Plaintiff showed increased energy and better decision making skills. She was assigned a current Global Assessment of Functioning (GAF) score of 60.

On September 9, 2004, an unidentified state agency employee called Plaintiff regarding any limitations she may have had as a result of depression. Plaintiff responded that her medication controlled any mood swings or symptoms of depression. She also stated that, on a typical day, she picked things up around the house with light house work, that she was a "laid back" person who got along with others, and that people visited often. She stated that she read or did scrapbooking for as long as she could sit, given her back condition, and that she did the cooking, except when the meal called for a long period of standing, and she then needed her husband's help. She stated that any limitations she has are mainly physical and that any depression she may have is controlled by her medications.

On September 13, 2004, K. Neville, Ph.D., a state agency psychologist, reviewed the record and concluded that Plaintiff did not have a severe mental impairment. He concluded that Plaintiff had only mild restrictions in the activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in concentration, persistence, or pace; and no episodes of decompensation. He noted that the record showed a GAF of 60, Plaintiff was euthymic, her

thoughts were logical and sequential, and the treating source opinion was that she had "mild depression" and that she had no impairment when performing simple tasks. He concluded that her depression was controlled with the use of medication. On a separate form, Dr. Neville noted the inquiry that had been made earlier that month and Plaintiff's indication that she had no limitations due to depression, as her medication controlled the condition. Thus, he concluded that her mental impairment was not severe.

### C. Plaintiff's Hearing Testimony

At the hearing in December 2006, Plaintiff testified that she lived in a two-story house with her husband, 17-year-old son, and 10-year-old daughter. She was five feet three inches tall, weighed about 185 pounds, and is right-handed. About three months previously, she had worked just less than a month. Just before she tried that job, she worked as a bathroom cleaner for about six months, but only about an hour a day. The last time she worked full-time was in approximately 2002 or 2003 as a bank teller.

Plaintiff testified that the physical conditions that prevented her from working included degenerative disc disease in her lower back, arthritis in both knees, and a previously torn anterior cruciate ligament (ACL) in the left knee. She had had surgery for the torn ACL, but the problem was not totally fixed. Her carpal tunnel surgery on the right had improved her condition about 50 percent. Plaintiff testified that these conditions affected her abilities to sit, stand, walk, lift, and carry.

Plaintiff testified that she was treated by Tina Martin, a nurse practitioner in Rochester, Indiana, whom she had last seen about two months previously, but that she had not been to a doctor since that time as she did not have medical insurance. She had seen this nurse practitioner every

couple of weeks for about seven years.  Plaintiff reported having epidural injections for pain and taking prescription medication.  Ms. Martin referred her to Dr. Nekoomaram and Dr. Pryor, both back specialists, and she said she last saw Dr. Pryor in 2003.  She testified that Dr. Pryor told her that her degenerative disc disease did not have a "permanent fix," that it was likely to slowly get worse, and that she was not at a point where surgery was needed.  She testified that Dr. Ronback, who had treated her knees and done the surgery for the ACL, stated after the surgery that exercising, taking it easy, and taking Celebrex was best for her.

According to Plaintiff, she was restricted from lifting more than 10 pounds by Ms. Martin and Dr. Pryor.  Plaintiff stated that they told her in about 2003 that she could increase the weight as tolerated, but not to go above 10 pounds.  She currently took only one medication, Premarin, because that was all that she could afford.

Plaintiff testified that, on a typical day, she arose at 7:00 a.m., got dressed long enough to take her daughter to school, returned home, and went back to bed generally for about 2-3 hours. Then she got up and tried to do what she could around the house, but it took her all day because she could only work for a limited time.  She only had breakfast or lunch when she was hungry, and she picked her daughter up at 3:00 p.m.  She started making supper at 3:30 or 4:00 p.m., and her family usually ate at 4:30 or 5:00 p.m.  After that, she sat in her chair and watched television.  Occasionally, she got up and sat at the computer.  She also did puzzles and went to bed between 10:00 and 11:00 p.m.

Plaintiff testified that she was able to dress, groom, and bathe herself.  She could do grocery shopping with her husband's help.  On a good day, she could do vacuuming and laundry.  Washing dishes was a challenge because it was hard to stand in one spot for a long period of time, so she

would was them intermittently. She enjoyed scrapbooking and doing puzzles. She did exercises that were given to her by Dr. Ronback, and she was just starting to use her husband's weight set.

Plaintiff testified that she has the psychological impairment of depression that affects her ability to work because it can cause her to be unmotivated, to have difficulty getting along with others, and to be emotional and grouchy. She stated that she was not currently seeing anyone for her depression but that she had seen Tina Martin, the nurse practitioner, in the past. She testified that in 2004, she had gone to Four-County Counseling where she saw Jean Halfast for about a year. During that time, she saw her once or twice a month for about an hour. Since she moved to Wolcott, she had been seeing Nancy Horhees, a counselor, but had stopped because she could not afford it. She thought she had seen Ms. Horhees for six months on and off about once a week or once every two weeks for an hour. Tina Martin had prescribed Effexor XR, and Plaintiff thought that the counseling helped her. Plaintiff stated that her mother-in-law had lived with her family previously, and she saw her about every three weeks. She stated that she helped out with the Parent Teacher Organization at her daughter's school. She sometimes felt grumpy and tried to avoid people at that time. She had concentration problems at times.

When her son was playing sports, she could not sit in the bleachers for a long time, so she stayed home most of the time. Plaintiff testified that she had pain in her back and legs. She had pain and muscle spasms between her shoulders and all the way down to the lower part of her back about 65 percent of the time. She testified that her pain radiated to both hips and down both legs to her feet. Sometimes the pain was warm and tingling; other times it was just constant. She testified she had the hip and leg pain all of the time and that the pain in both knees was excruciating and sharp. If she stood too long, she got numbness, tingling, and a warm sensation in her legs down to her

calves. She testified that she had knee pain 100 percent of the time, the pain in the lower back was present 100 percent of the time, and the muscle spasms were present 65 percent of the time. She did not bend unless she "absolutely [had] to." R. 391. The only thing, other than medication, that helped her pain was "relaxing." Plaintiff thought that the maximum she could lift was weight equivalent to a gallon of milk. Over the course of an eight-hour day, she thought she could walk eight hours, stand about an hour, and sit about a half hour in a chair similar to the one in the hearing room. Plaintiff testified that she cried two or three times a day and that sometimes she was really grumpy.

In response to questioning by her attorney, Plaintiff testified that when she walks a couple of blocks, her knees give out and she falls. Asked how many times she would fall if she walked eight hours a day, Plaintiff said she never thought about that and that she had not really understood the prior question. She could not walk constantly and had to hold onto a cart in the grocery store. A knee brace did help prevent her knees from going out.

When she had worked a little less than a month about three months previously, she assembled pressure gauges. She was able to do this despite her problems with carpal tunnel syndrome because she could take a break when her hand started to get numb or tingly. She acknowledged that she did regain the strength in her hand. Plaintiff testified that she left this job due to her pain; she had to stand on a concrete floor and that was too much pressure on her back and legs.

Plaintiff testified that she could sit in a straight chair for 15-20 minutes and then she had to get up and walk around. She could vacuum for five to ten minutes at a time. Her husband helped her with the dishes and the vacuuming. She had trouble concentrating due to the pain. During the

colder part of the year she had bad days about five times a week, but during the summer, she had about three bad days a week.

### D. Testimony of Plaintiff's Husband

Plaintiff's husband testified that when Plaintiff has a bad day she cries, is hunched over about half way, and favors her knee. He testified that when she falls to the ground, he has to pick her up, and she cries. He stated that Plaintiff does not sit very long due to her back pain and she has to get up and stand. He testified that he helped with the chores and that Plaintiff could not walk through the grocery store with a cart for more than ten minutes. He stated that it did not take much to upset her.

### E. Testimony of Vocational Expert

After Plaintiff's testimony, the ALJ questioned the Vocational Expert (VE). The ALJ having questioned Plaintiff about her past work experience, the VE testified that of the three past positions, Plaintiff's bank teller position (211.362-018) was semiskilled and light, but sedentary as performed; Plaintiff's food service position (318.137-010) was unskilled and medium, but light as performed; Plaintiff's retail sales position (290.477-014) was semiskilled and light, and light as performed. R. 409. At that point, the ALJ instructed the VE to assume a hypothetical individual

> in the age range of 32-34, educated[sic] a high school graduate level, limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently, stand and walk, sit about six hours in an eight hour-day, and limited to frequent handling, fingering, and feeling with the right upper extremity.

R. 410. The VE testified that those hypothetical limitations would eliminate the Plaintiff's food service position in general, but would not eliminate it as Plaintiff performed it, and that performance of the other two prior jobs would still be feasible. The VE also concluded that the hypothetical would allow for 1,700 sedentary jobs and 13,000 light jobs in the region.

The ALJ then modified the hypothetical so that the sit\stand option would be at will. The VE responded that this would eliminate Plaintiff's past work except for her banking position as she performed it, but not as generally performed. Additionally, the light jobs would also be excluded, leaving 2,000 possible sedentary unskilled jobs. The ALJ also asked the VE if any of those jobs would be available should the ALJ find all of Plaintiff's testimony credible and all of her alleged impairments supported by medical evidence. The VE responded that the final hypothetical would eliminate all the positions because Plaintiff would be unable to work with people.

### STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence.[2] 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will only reverse if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).[3] Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment

---

[2] In her brief, Plaintiff incorrectly refers to the Secretary of Health and Human Services rather than the Commissioner of Social Security. *See* Social Security Independence and Program Improvements Act of 1994, Pub. L. No. 103-296, 108 Stat. 1464 (codified as amended in scattered sections of title 42 of the United States Code).

[3] Throughout her brief, Plaintiff primarily cites the law of the district courts and the appellate court within the Third Circuit Court of Appeals rather than the law of the Seventh Circuit. Plaintiff also incorrectly attributes the decision in *Bennett v. Barnhart*, which was decided by the United States District Court for the Western District of Pennsylvania, to "this Court." *See* Pl.'s Br., pp. 24-25; *see also Bennett v. Barnhart*, 264 F. Supp. 2d 238 (W.D. Pa. 2003).

for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford*, 227 F.3d at 869; *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as

an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. § 404.1520(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to Step 2; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to Step 3; (3) Does the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to Step 4; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to Step 5; (5) Can the claimant perform other work given the claimant's residual functional capacity ("RFC"), age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). "The RFC is an assessment of what work-related activities the

claimant can perform despite her limitations." *Young*, 362 F.3d at 1000. The ALJ must assess the RFC based on all relevant evidence of record. *Id.* at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Id.* at 1000; *see also Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

In her brief, Plaintiff makes the following arguments: (1) the ALJ does not give her treating physician's opinion the proper weight and improperly discounts "pertinent medical evidence;" (2) the ALJ's credibility determination improperly dismisses her persistent efforts to obtain medical treatment; (3) the ALJ's residual functional capacity determination is faulty; and (4) the hypothetical the ALJ posed to the VE did not incorporate all of her impairments supported by the medical evidence of record. The Court addresses each argument in turn, finding that the ALJ did not make any errors of law and that his decision is supported by substantial evidence of record.

### A. Weight of Treating Source Opinion

Plaintiff asserts that the ALJ did not assign the proper weight to Plaintiff's own treating physicians, arguing that the ALJ is required to give a treating source's opinion controlling weight as long as it is not inconsistent with the record.[4]

The law is clear that an ALJ must give the medical opinion of a treating doctor controlling weight as long as the

---

[4] The Court notes that Plaintiff's brief references the medical opinions of a "Dr. Thomas" and a "Dr. Hope," *see* Pl.'s Br., p. 22; however, Plaintiff does not identify any documents in the record referring to either doctor. The Court has been unable to locate any opinions by or references to either of these physicians in the record, and the Commissioner does not mention either doctor in the response brief. Accordingly, the Court disregards any arguments made by Plaintiff based on the alleged opinions of these doctors.

treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record . . . .  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section . . . in determining the weight to give the opinion.  We will always give good reasons . . . for the weight we give to your treating source's opinion.

20 C.F.R. § 404.1527(d)(2); *see also Nicholson v. Astrue*, No. 08-4016, 2009 WL 2512417, at * 3 (7th Cir. Aug. 18, 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); SSR 96-8p; SSR 96-2p.  However, courts have acknowledged that a treating physician is likely to develop a rapport with his or her patient and may be more likely to assist that patient in obtaining benefits.  *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).  An ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ is able to "minimally articulate his reasons for crediting or rejecting evidence of disability."  *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Clifford*, 227 F.3d at 871 and quoting *Clifford*, 227 F.3d at 870).  Moreover, when there is no evidence to reject, the ALJ is not required to articulate the reasons for accepting a state agency's determination that the claimant is not disabled.  *See Scheck*, 357 F.3d at 701 (quoting *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988)).

In this instance, there was no evidence for the ALJ to reject.  The ALJ noted in his decision that "[t]he state agency medical consultants also determined that [Plaintiff]'s impairments were not of sufficient severity to satisfy the listings, with which [I] concur[]."  R. 21.  Dr. Corcoran, the state agency medical consultant, responded in the negative to the question on the physical residual functional capacity assessment form as to whether there are treating or examining source

conclusions about the claimant's limitations or restrictions that are significantly different from his findings. At length, Plaintiff cites the legal standards for the weight an ALJ should give a treating source opinion and argues that the ALJ in this case "obvious[ly] reject[ed]" the treating source's opinion. However, Plaintiff fails to identify any specific rejection by the ALJ of a treating source's opinion, any treating source's opinion that was allegedly rejected, or, more importantly, any medical record that would contradict either the state agency's determination or the ALJ's conclusion. In reviewing the record, the Court was unable to find any instance where a treating source's evidence contradicted the conclusions of the state agency. Because the ALJ did not reject Plaintiff's treating sources, the ALJ was not required to articulate the reasons for accepting the state agency physician's determination.

Plaintiff also argues that the state agency physician's opinion should be given less weight based on additional exhibits she submitted after the state agency physicians reviewed the record. Although she states in her brief that she submitted nine additional exhibits, she cites only exhibits 14F, 15F, 17F, 18F, and 19F, some of which contain reports from more than one provider. Despite noting that she submitted additional exhibits, Plaintiff again does not cite any specific finding or opinion in those exhibits that is inconsistent with the state agency physician's opinion. Of the additional evidence submitted, the only evidence that is relevant to the claims in her disability application and appeal are related to the injury to her knee while doing the limbo with her children in November 2004. The ALJ specifically addressed this evidence and found that "[t]here are no medical findings that would suggest [Plaintiff] did not have a beneficial outcome from the arthroscopic surgery to the left knee and right carpal tunnel release" and that Plaintiff's "rehab potential was termed good" by her own treating physician. R. 22-23 (citations omitted). Plaintiff

neither cites nor discusses how any of these exhibits would contradict the findings of the state agency physician or the ALJ's RFC.

Finally, the only statement of any limitation for Plaintiff made by a treating physician is the April 4, 2004 note from Dr. Nekoomaram, an orthopedist Plaintiff saw on a few occasions, which prohibits Plaintiff from lifting not more than 10 pounds at work, with the comment that "if there is no job with that restriction available, then she remains off work for three w[ee]ks." R. 112. This note was written prior to Plaintiff's alleged onset date of May 24, 2004, and there is no indication that this note imposing a three-week limitation constitutes a medical opinion regarding long-term limitations. The ALJ did not err in relying on the state agency physician's opinion.

### B. ALJ's Credibility Determination

In one sentence, Plaintiff argues that the ALJ's credibility determination is flawed because he failed to take into account her efforts to relieve her pain on multiple occasions. An ALJ is in the best position to observe witnesses and to make an appropriate evaluation as to their credibility. *Skarbek*, 390 F.3d at 504. Thus, a reviewing court will not reverse an ALJ's credibility determination unless it is "patently wrong." *Schmidt*, 496 F.3d at 843 (quoting *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003)). In making a credibility determination, SSR 96-7p provides that the ALJ must consider the record as a whole, including objective medical evidence; the claimant's statements about symptoms; any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant; and any other relevant evidence. *See* SSR 96-7p.

When there is objective medical evidence that could reasonably be expected to produce pain, an ALJ must consider a claimant's subjective complaint in light of such evidence. *Craft v. Astrue*,

539 F.3d 668, 678 (7th Cir. 2008); *see also* 20 C.F.R. § 404.1529(c)(1). An ALJ is also not allowed

to "discredit a complaint of pain simply because a plaintiff did not introduce objective medical

evidence to support the extent of the pain, but 'neither [is he] required to give full credit to every

statement of pain, and require a finding of disabled every time a claimant states that [he] feels unable

to work.'" *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996) (quoting *Pope v. Shalala*, 998

F.2d 473, 486 (7th Cir. 1993)) (internal quotations omitted); s*ee also* 20 C.F.R. § 404.1529(c)(2);

SSR 96-7p at *6 (providing that a claimant's statements regarding the intensity or persistence of her

symptoms "may not be disregarded solely because they are not substantiated by objective medical

evidence").

Factors to be considered by an ALJ evaluating a claimant's complaint of pain or symptoms

include:

> (i) The claimant's daily activities;
> (ii) The location, duration, frequency, and intensity of the claimant's pain or other symptoms;
> (iii) Factors that precipitate and aggravate the symptoms;
> (iv) The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;
> (v) Treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;
> (vi) Any measures other than treatment the claimant uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> (vii) Any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); SSR 96-7p at *3.

In the instant case, the ALJ fully supported his reasoning that Plaintiff's subjective

complaints were not fully credible. The ALJ referenced the notes from the Four County Counseling

Center as explaining that Plaintiff was only experiencing mild depression. The ALJ also notes that

there is no evidence of record that support Plaintiff's allegations concerning her weak knees giving way causing her to fall frequently. He wrote, "There are no medical findings that would suggest [the Plaintiff] did not have a beneficial outcome from the arthroscopic surgery to the left knee and right carpal tunnel release." R. 22. The ALJ noted that the postoperative treatment plan was for outpatient physical therapy three times a week for four weeks and that Plaintiff's rehabilitation potential was assessed as "good." As for her back, the ALJ noted that Plaintiff was presently receiving only symptomatic management of her lower back complaints and had never undergone (or been recommended for) spinal surgery. Finally, the ALJ noted that Plaintiff was actively involved in her daughter's schooling, including the Parent Teacher Organization, she performed regular household activities, she was not currently engaged in any mental health treatment, her prescription medications did not cause side effects, and she took part in a home exercise program. The ALJ determined that, although Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible. Given the level of support the ALJ provided in his determination that Plaintiff was not fully credible, the Court finds that his decision is not "patently wrong."

### C. Residual Functional Capacity

Plaintiff argues that the ALJ's RFC determination is flawed because the RFC "substantially contradicts or conflicts with the opinions given by her treating physicians, the ALJ did not take into account her and her husband's testimony regarding her limitations, the ALJ did not adequately describe her work-related limitations, and the ALJ failed to apply the social security ruling related

to her obesity. For the reasons set forth below, the Court finds that the ALJ's RFC determination is supported by substantial evidence and is not based on legal error.

An RFC represents the maximum capacity of an individual to do sustained work on a regular and continuous basis and not the minimum an individual can do despite his or her limitations. SSR 96-8p at *2. To formulate an RFC, an ALJ must articulate the reasons for his assessment, and the reviewing court is required to confine its determination to those reasons. *See Getch v. Astrue*, 539 F.3d 473, 481-82 (7th Cir. 2008). In his reasoning, an ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings . . . ." *Young*, 362 F.3d at 1002 (quoting *Scott*, 297 F.3d at 595); *see also Simila v. Astrue,* 573 F.3d 503, 513 (7th Cir. 2009) (noting that an ALJ is not required to mention every piece of evidence but only enough to create an "accurate and logical bridge" to support the ultimate decision). A denial of benefits cannot be sustained when the ALJ fails to articulate the basis for his RFC determination. *See Brindisi v. Barnhart*, 315 F.3d 783, 786-87 (7th Cir. 2003); *Scott*, 297 F.3d at 595-96.

In this case, the ALJ assigned Plaintiff with the following RFC: "she is able to lift/carry 20 pounds occasionally and 10 pounds frequently; she is able to stand/walk/sit about six hours in an eight-hour workday; and she can frequently handle, finger, and feel with the right upper extremity." R. 21. In his decision, the ALJ relied on Plaintiff's work history of light/sedentary work, performance of regular household chores, and participation in her daughter's schooling and a home exercise program. The ALJ remarked that Plaintiff was not currently receiving mental health treatment and that her medications were not causing any side effects. He also found that the RFC was consistent with the medical evidence of record, which was in turn consistent with the state

agency medical consultant. As held in the previous sections, the ALJ did not err in relying on the

state agency consultant's opinion, and the ALJ did not err in his credibility determination. Plaintiff

has not identified any medical evidence of record, nor has the Court been able to identify any,

indicating that Plaintiff is unable to perform the range of work set forth by the ALJ in her RFC.

Plaintiff also argues that the ALJ's RFC fails to take into account her obesity as required by

the social security rulings. Pursuant to SSR 02-1p, an ALJ should consider the effects of obesity

when combined with a claimant's other severe impairments as it may produce a greater than

expected effect absent obesity. SSR 02-1p at *6.[5] In determining a claimant's RFC, an ALJ must

evaluate all limitations that arise from medical evidence, including those limitations that may not

be severe. *See* SSR 96-8p; *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) (considering obesity

in combination with other severe impairments). A failure to expressly consider the combined effects

of a claimant's obesity can be considered a harmless error if the ALJ adopts the limitations

suggested by specialists and reviewing doctors who were aware of the condition. *See Prochaska*

*v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006) (citing *Clifford*, 227 F.3d at 873). In this case,

the ALJ specifically noted at step 3 of the sequential evaluation that, pursuant to SSR 02-1p, he

considered the effect of Plaintiff's obesity on her other impairments in both his assessment of

medical equivalence and the remaining steps of the sequential evaluation. Moreover, the ALJ

adopted the opinion of the consultative physicians who were aware of Plaintiff's weight. Any lack

of more specific analysis by the ALJ is harmless given that Plaintiff makes only a passing reference

to the ALJ's consideration of her obesity without any clarification as to how her obesity adversely

affects her ability to work. *See Skarbek*, 390 F.3d at 504 (finding that an allegation that an ALJ

_____

[5] Plaintiff cites SSR 00-3p, which was superseded by SSR 02-1p in 2002.

failed to mention a claimant's obesity is not enough to remand a case when reviewing doctors upon whose opinions the ALJ relied were aware of the obesity and when the claimant fails to specify how the obesity impairs the ability to work).

Next, Plaintiff argues that the ALJ failed to consider and specify the length of time that she is able to sit, stand, or walk separately. However, her argument misstates SSR 96-8p's decree that "[e]ach function must be *considered* separately . . . even if the final RFC assessment will combine activities (e.g., 'walk/stand, lift/carry, push/pull')." SSR 96-8p at *5 (emphasis added). The ALJ prefaces his RFC explanation by noting that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent . . . ." R. 21. As long as the ALJ has made an assessment function-by-function, the final RFC does not need to be articulated as such and may be supported by a narrative discussion of the claimant's symptoms and medical source opinions. *Knox v. Astrue*, No. 08-3389, 2009 WL 1747901, at *5 (7th Cir. June 19, 2009) (citing cases). The ALJ in this case satisfied this requirement as the RFC properly contained a concise statement of the impairments that limit Plaintiff's ability to work and the ALJ discussed the medical evidence of record and Plaintiff's credibility. *See id.* (holding that the discussion requirement can be satisfied by analyzing objective evidence and assessing credibility). *Id.* Once again, Plaintiff has not drawn the Court's attention to any evidence that would contradict the ALJ's conclusion. Therefore, the ALJ's RFC assessment was proper.

Finally, there are two references in Plaintiff's brief to her mental impairment of depression. First, she includes "depression" in a list of her severe impairments. *See* Pl. Br., p. 5. Second, in her final argument regarding the hypotheticals posed to the VE by the ALJ, Plaintiff quotes *Bennett v.*

*Barnhart*, 264 F. Supp. 2d 238 (W.D. Pa. 2003),[6] which addressed the inclusion of severe mental impairments in a hypothetical.  The ALJ in this case did not find that Plaintiff suffered from a severe impairment of depression, and Plaintiff does not explicitly argue that the ALJ erred.  To the extent the references to her mental impairment could constitute such an argument, Plaintiff provides no analysis of what evidence would support a finding of a severe mental impairment and any such argument is unpersuasive.  The ALJ sufficiently reviewed the medical evidence and properly conducted the "special technique" required to assess a claimant's mental impairments pursuant to 20 C.F.R. §404.1520a.[7]  The ALJ concluded that Plaintiff has a "mild" rating in the functional areas of activities of daily living; social functioning; and concentration, persistence, or pace and that Plaintiff did not have any episodes of decompensation.  While there is evidence regarding Plaintiff's mental health, the substantial evidence of record supports the ALJ's mental RFC.  *See, e.g. Ketelboeter v. Astrue*, 550 F.3d 620, 626 (7th Cir. 2008) (finding that, without any medical record showing that the claimant's anxiety or depression affected his or her work, no mental impairment could be found).

---

[6] Plaintiff quotes: "Because [the claimant's] severe mental impairments were not incorporated into the ALJ's hypothetical question . . . , the ALJ could not rely on the VE's testimony as substantial evidence in support of the denial of benefits."  *Bennett*, 264 F.Supp. 2d at 256-57.  It is not clear whether Plaintiff is asserting that the ALJ failed to consider her mental impairments in the hypothetical, or whether Plaintiff is arguing generally that the ALJ failed to consider impairments in the hypothetical and simply cites a case that dealt with a mental impairment.

[7] This evaluation is a five-step process that begins with the ALJ's examination of "pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s)."  *Id.* § 404.1520a(b)(1).  If the ALJ determines that the claimant has a mental impairment, the ALJ must assess and rate the limitation in four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  *Id.* § 404.1520a(c)(3); 20 C.F.R. pt. 404, subpt. P, app. 1, pt. A, § 12.00C.  The first three of these categories are rated on a five point scale: none, mild, moderate, marked, and extreme.  20 C.F.R. § 404.1520a(c)(4).  This final category is rated using a scale of none, one or two, three, and four or more.  *Id.*  If an ALJ determines a claimant has a rated limitation of none or mild in the first three categories and a rated limitation of none in the fourth category, the ALJ will generally conclude that the claimant does not have a severe mental impairment.  *Id.* § 404.1520a(d)(1).  If the ALJ does not find that a claimant has a severe mental impairment, the ALJ will then assess the claimant's RFC.  *Id.* § 404.1520a(d)(3).  The ALJ must incorporate the aforementioned "special technique" evaluation into the final written decision.  *Id.* § 404.1520a(e)(2).

## D.  Hypothetical Question

Plaintiff's final argument is that the ALJ's hypothetical question to the Vocational Expert was flawed because it did not contain all of Plaintiff's impairments supported by the record. However, an ALJ's hypothetical question should only include those limitations that the ALJ finds credible.  *See Jens*, 347 F.3d at 213; *see also Simila*, 573 F.3d at 513 (finding that an ALJ is not required to include limitations that are not credible into his or her hypothetical question).  As discussed above, the ALJ did not err in his credibility determination or his formulation of Plaintiff's RFC.  Accordingly, the hypothetical, which set forth limitations consistent with the RFC, was proper.

## CONCLUSION

For the foregoing reasons, the Court finds that the decision of the ALJ is supported by substantial evidence and does not contain any errors of law.  Therefore, the Court **DENIES** the Social Security Opening Brief of Plaintiff [DE 16] and **REAFFIRMS** the ALJ's decision in all respects.

SO ORDERED this 31st day of August, 2009.


s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:  All counsel of record